Goodwin's conviction arose from a very bad day of travel. The judge swore at the state's attorney. The state's attorney, because of that, Mr. Goodwin, pointed at her and laughed at her and said that you made the judge angry. The state's attorney then said, you're on bond, have a seat, to her, according to Mr. Goodwin. Mr. Stiglitz, let me help you out. We know the facts of the case. Okay. We know what he said, what he didn't say. I think your issue is, he didn't threaten her. That's right, Your Honor, and I would say, for argument two, the reason for that argument, this court should apply people versus Dye and reverse his conviction outright. In that case, the Fifth District reversed the defendant's threatening a public official conviction because the court found the defendant not a true threat. Dye and the public defender in her office had a heated discussion. Counsel, let me interrupt you. I'm so sorry, but let's get to the analysis of true threat. I mean, in the research that most of us have done, all of us have done, even the various circuits of the U.S. Court of Appeals have different analysis for this. Is there a standard in Illinois as to what the analysis for true threat should be relative to subjective, objective, recipient, speaker? What case do we look for to give us that analysis? I would say Dye would at the present time, Your Honor. But because this is, in quotation, a First Amendment right, right to speech, I think that you should say that the defendant intends to make a threat. And, in fact, the definition of a true threat in black is a serious expression of an intent to communicate an act of violence, a lawful violence. Is there any concern about the recipient? Or do we consider the recipient at all? I think you have to. Well, there is, of course. There is not really a real consideration of the recipient in that the defendant, there's an access race here. The access race is making the threat. And if it's a true threat, again, it has to be, at least Dye will think, an intentional threat. And that is, of course, to make sure that we are only punishing speech that's prescribable by the First Amendment. We want a very clear statement by the defendant that this is a threat. This isn't something else, especially when we're talking about threatening a public official, because in some regard, the First Amendment, this is a core protection of the First Amendment is you have a right to criticize public officials, even if it's caustic, even if it's degrading and insulting. You have that right in this country. And if you're going to criminally punish someone for addressing a public official, you should be absolutely clear that that person is intending to threaten that person. And again, I'll get to Dye, where the defendant in that case, during this argument, said two or three times, well, I'll get you, I'm going to get you. And he pointed at the public defender, who was very scared, who was crying, who called the police, and Mr. Dye was convicted. But the, of course, the Fifth District said, well, he might have been meaning that he was going to report her to a judge or the RDC. We don't know if he was, by saying, going to get you, that meant I'm going to threaten you violently, or again, I'm going to report you to the authorities. And, of course, in this case, we don't even have a statement of I'm going to get you. We have swearing, we have I want your name, come out here and talk to me. When the prosecutor left the, when the other prosecutor left the office and told Goodwin to back off, he did back off. And then he said, I want the essay's name, and I'm calling my lawyer. There's absolutely nothing in his speech or conduct that shows the intent to make a true threat here. So you're concerned at all about the jury instructions, 11.49, 11.50, and 1333F. Do you recall those? Well, particularly 1333F, used in this case, which says, which defined a threat as, of course, exposing a public official to hatred, ridicule, or contempt. Well, exposing a public official to those things is protected by the First Amendment, clearly. And, of course, I'm arguing that defense counsel is ineffective for not challenging that instruction and for not requesting a true threat instruction as well. Well, specifically on the 1333F, is there any standard that's in there, intentional, knowingly? Is there anything prescribed in there to advise the jury as to how to go about doing whatever it is? Well, not in the 1333F. That's just defining what a threat is. And so in this case, it was violence or restraint or, again, hatred, contempt, or ridicule, which, again, of course, is totally improper in this setting. In the statute, it's knowingly, the defendant must knowingly convey a threat that would put the public official in reasonable apprehension of great bodily harm. But even that standard is a lower standard than the true threat standard in black, where there has to be, again, a serious expression of an intent to act violently towards the recipient of the communication. What do we do with the unlawful restraint issue? Well, I think that in this case, to save judicial resources, the restraint conviction has to go, too. Do we have jurisdiction to even address the restraint? I would argue that you do, because here, well, Rutherford, as we all know, recently said you can't, the public shouldn't vacate a conviction without a sentence on it if we don't know what the reasoning was for not sentencing. Here we know the reason was that the court improperly merged it. And so I would argue, Your Honors, that, again, that there is no threat, there's no fighting words here. There's no way you can punish a goodwin for unlawfully restraining the ASA. And, therefore, if you reverse the threatening a public official conviction, you should likewise reverse the unlawful restraint conviction. But it's unsentenced. It's an unsentenced conviction.  And, again, if you reverse the threatening a public official conviction, that conviction will automatically arise. Improper merger is based on what? I'm not sure why the judge did that, Your Honor. Well, what's your argument? I mean, why is it wrong, the merger? They're two separate offenses. And, again, this offense will spring up if the threatening a public official conviction is reversed. And then we'll be right back here with no other appeal. If it goes back down, we'll appeal, and then we'll be right back here. So I would argue, again, safe and just resources to reverse that conviction as well. Counsel, thank you. Thank you, Your Honor. Thank you. State? Assistant State Attorney Brian Hodes on behalf of the people of the state of Illinois. I think what I'd first like to do is talk about the different standards. Illinois has the standards for whether it constitutes a true threat, whether we're using the objective or the subjective. Well, before we get to that, Counsel, you've got to tell me, in your brief, you talk about how threatening a public official, Section 12.9, it encompasses true threat. That's what you state in your brief. Yes. How does it encompass true threat? Basically, it doesn't use the terms true threat, but if you compare the language in Black, which is the language that is generally accepted as defining what constitutes a true threat, it correlates with it. For example, Black says, and this goes for the jury instruction as well, Black says the true threats encompass those statements where the speaker means to communicate the serious expression of intent or commit an act of unlawful violence to a particular individual or group of individuals. In this case, the particular group of individuals would be the public officials defined by the statute. It doesn't say intent? It means to communicate a serious instruction of an intent or commit an act of unlawful violence. Okay. And it says the speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, including to protecting, excuse me, in addition to protecting people from the possibility that the threat and violence will occur. So it's a serious expression of intent. Is there anything in 12.9 that talks about intent versus knowing, knowingly? I think you can read that into it. How we can look at our statutes. Yes. Intent and knowing, I think, are consistent in this sense. Are these the same? Well, it's similar to an assault in this case, what happened. The criminal case, I mean, is intent the same as knowing? Yes, yes. People are intended to do what they do, unless it's a very unusual situation. This isn't one. Also, I wanted to, I wasn't finished with the definition under the back. I wanted to say something else. Intimidation in the constitutionally prescribable sense of the word is a type of real threat where a speaker directs a threat to a person or group or persons with the intent of placing the victim in fear of bodily harm or death. Didn't the victim testify that the defendant never verbally threatened her with bodily harm? The victim test, the threat in this case was not that sort of threat. The threat, that's why this whole First Amendment argument is problematic because the threat that the victim posed was immediate and physical. It was not a text. It was not an email sent out. It was not a tweet. It wasn't a statement per se. Yes, the victim, the defendant said threatening things, although he didn't say I'm going to do X, I'm going to get you, I'm going to shoot you. It was the manner in which his physical demeanor, the way in which he confronted her, the way in which he got in her face, the way in which he physically blocked her, and then the way in which he stood outside of the office cursing and yelling that posed the imminent, direct, physical threat and intimidated her within the meaning of the statute and within the meaning of the true threats doctrine. It is not amenable to the sort of, I guess you could say, academic true threat analysis that we are all too often forced to do these days because of social media and things. Most of the cases that you read these days involve social media and things. Did someone's posting on Facebook in the Eliana's case constitute a true threat? Well, gee, it was posted on Facebook and he was emulating a rapper. No, this person was right in front of the victim. So, counsel, are you saying this was a true threat or it wasn't? I'm saying that it was a true threat, but I'm saying that it was not akin to those sorts of true threats or not true threats in most cases because it was immediate and physical. How is this any different than die, where the defendant was in the office of the public defender, was aggressive toward her, and had to be removed by someone in the office and said, I'm going to get you? Well, here's what happened on die. The defendant in die was asked to leave, and he left. In this case, the defendant was asked to leave, and he doubled down and screamed at the person who asked him to leave and scared her back into the office. Die took place during a heated exchange between, and the court noted this in the decision, it said, well, you can explain what the defendant said because it was during a heated exchange. Wait a minute. When did the victim ask the defendant to leave? Are you talking about in the courthouse or when he got to her office? When? I'm talking about the die case. No. Justice Connors compared this case to die, and I'm asking, you said the difference is that in die, the defendant was asked to leave, and he did. And in this case, the defendant was asked to leave, and he didn't. That's true. Who asked the defendant to leave? ASA Cheswick. When did the victim, in this case, ASA McGill, when it was in the office? I read the facts, and I don't remember the victim asking the defendant to leave other than at the courthouse. At the courtroom, she told him to sit down. Is that what you're referring to? I'm referring to the other ASA. I'm sorry if I wasn't clear. The other ASA, ASA Cheswick, once ASA Gill was inside, came out, opened the door and said, leave, basically. Did he move away from the door? He backed away from the door. Seven feet. Then he basically doubled down and screamed and yelled at her. He did not leave. It was at that point that they called the supervisor, and then, eventually, a man wearing a uniform came and got the defendant. So he did not leave, as in the other case. Also, to distinguish it from Dye, in Dye, the case, the appellate courts ultimately focused on a single, well, repeated statement the defendant made. The defendant said, I'm going to get you to this public defender who was the alleged victim in Dye. And the court said, based on the context of this, that was ambiguous. Also, it so happens that the public defender asked Dye in that case, are you threatening me? Because it was, again, during a heated exchange, and the defendant said, no, I'm not threatening you. There's no similar exchange here. There's no ambiguity in defendant's actions. There was no heated exchange. There's a one-way terrorization by the defendant towards the victim here. There's no ambiguity for us to say, we don't know whether what he meant by I'm going to get you, am I going to report you, I'm going to do this. In this case, the victim testified that the defendant called her some pretty distasteful names, but did he threaten her in any way? He didn't really threaten her, but he threatened her by the combination of the names he called her. By calling her names and being close to her and just generally acting in a very crude and unruly manner, right? That constitutes a threat in your argument. I would take it one further. I think that he got close enough in the way in which he communicated these words and his physical presence. He got right in her face. He pointed at her. He was within six to eight inches. She would try to go one way and walk around him. He would block her. She got to the door to try to get into the office. He blocked the office door. Someone had to push him out of the way so that she could get into the office. Then he set up camp essentially outside the door and screamed and yelled into the door until eventually someone, a man carrying a badge and a gun basically, got him to leave. That's what the totality of the threat was. So no, he never said I'm going to do X or Y to you as in some of these cases that are in some sense more amenable to an academic First Amendment analysis, I would say. What we've got here is conduct and conduct that has to be evaluated really in the moment and under the circumstances in order to determine whether or not it violates the statute and constitutes a true threat. Well, you have to establish that he intended to place her in a mindset that she had fear of receiving bodily harm. That had to be his intent, isn't that what Black says? Well, Black, it depends on which version you take. I think there's a reasonableness component no matter how you look at it. And I think what he did was reasonably place someone in fear. Did he intend to place her in fear of bodily harm? I think that from those facts, you have to assume by those actions, you have to infer the reasonable inferences that he intended to place her in fear. Otherwise, I find those actions somewhat inexplicable. Wasn't his testimony that he was just trying to get her name and information because she's the one that said something to him on the way out of the courtroom that was upsetting? That's his testimony. But his testimony, the jury heard his testimony, and the jury watched him testify, and they heard all these other people testify too. And apparently they didn't accept his testimony. They accepted her testimony, which was corroborated by all the other witnesses and a number of the facts. And they didn't accept his testimony, which was not corroborated and in some cases directly refuted by other evidence. Counsel, as far as what you think the test for a true threat would be, you claim it's whether the reasonable recipient would interpret the words as a threat. Is that right? Yeah, I think that's a fair test. That was the test, I believe, that the appellate court adopted in Diomedes. I believe that's how that case is pronounced. Well, this kind of flies in the face of Black, though, does it not? I don't believe that Black altered that. Are you talking about the intent of the speaker? I talked about it, but I don't think that Black altered the alternate test. And one of the reasons I don't think that Black altered the test was that when the issue of figuring out, first of all, Black was at that point a plurality, so it wasn't. But the big thing I would point out is that when the issue next got to the U.S. Supreme Court, in a case fairly recently, in a case called Elianas, the Supreme Court did not make a decision either way about which they said the issue is still open as to what the proper intent is. And the reason we know that they said it was still open was in deciding the case, the majority said really he was open, and some of the dissenting justices were unhappy that they hadn't crossed that point and made that decision. So, and a number of appellate courts, federal appellate courts, have continued to apply the so-called objective test. But they're all over the place. They have four or five different interpretations. Yeah. But in Illinois, we have Dye and Wood, do we not? We have Dye and Wood. And we have Diomedes, and we have a number of other decisions. We have, it's not a, it certainly isn't a done deal. But I don't think that Black, I would suggest that Diomedes, that Black didn't alter things, and that Diomedes is still the correct decision, and that the U.S. Supreme Court's decision in Elianas suggests that Dye and Black were incorrect in assuming that Black changed the landscape. I also would suggest that whichever standard you apply to the facts of this case, the defendant was guilty, properly found guilty by the jury. And if there are no further questions on that, I did want to briefly address the jury instruction issue. I'd like you to address the unlawful restraint issue. Okay. Tell me specifically, what did he do that unlawfully restrained him? Well, let's see. He prevented her from going into her office by blocking the door. Then when she got in the office, his actions essentially confined her to the office. The unlawful, the extant unlawful restraint cases do not talk about a specific duration that one needs to have to have an unlawful restraint. What did he do that confined her to the office? I understand that she was upset and she was crying and so on. But people came and went from that office during that period of time when the defendant was outside. What did he do specifically that confined her to the office? Well, I think his restraint was specifically directed at her. It wasn't that no one can come or go from the office. And she had hoped, as I recall in her testimony, that once Mr. Montes left the office that the defendant would go as well. But he didn't. And when A.S.A. Chesek, the other A.S.A., went out and asked him to go away, he basically doubled down on his insistence that he wanted A.S.A. Gill. He asked for her name. Isn't that what he said he wanted? He asked for her name and her personal information. He didn't think he needed to curse and swear. And he did it in such a manner that he scared A.S.A. Chesek. This is the thing that I think you can't capture with just the raw words of the test, the tone, the physicality of the whole thing, and that's why we have juries and stuff in cases like this where people are actually present, is that he basically trapped her in that office and she felt she couldn't leave. And A.S.A. Chesek agreed that she couldn't leave. And they called A.S.A. Gill's supervisor, and they also sent for someone with law enforcement to get defendant away so that she could leave. And I think that proved the less-than-included offense of unlawful restraint in this case. Counsel, do any of the jury instructions talk about true threat? Any of the jury instructions describe that? Yes, that was the next thing I wanted to discuss, if I may. Very quickly, you're using up your time. Excuse me? Very quickly, you're using up your time. Which one? 1150 basically defines truth. 1150 is the corresponding issue instruction for 1149. It defines the offense of threatening a public official in a manner that is wholly consistent with the true threat's offense. Does that have intent at all? Yes, it does. The only difference with... It does? Yes. What does it say? Knowing. Knowing, deliberative, reputative. I think intent is built into it. The only real difference is that it doesn't use the phrase true threats. Okay? But the phrase... That's a legal term of art. True threat? Yeah, yeah. I mean, they don't need to say true threats to a jury. That won't mean anything special to them. It describes true threats in the same terminology that true threats are defined by courts from black onward. And it clearly... And that was the master instruction, essentially. So the fact that there was... There were these other instructions that were given on the word threat doesn't in any way impinge upon the master instruction. The jury could have found, oh, there was a threat that was given, but it wasn't a true threat, and not found them guilty on it. That's the 1333-F instruction. They didn't know anything about true threat. They weren't instructed anything about true threat. They didn't hear the words true threat. They were instructed on... My position is they were instructed on true threats because the true threat doctrine is essentially encompassed in 1150 and 1149. Counsel, thank you. Thank you. We're closed? I would just like to point out whether the mental state is intent, which I believe it should be, or knowing, as it reads in the statute, a true threat is a higher standard than how the threat is defined in the statute. And moreover, when there was this activity outside of the office, when A.S.A. Churchill came out, again, he backed up, and he said, I want her name. I'm calling my lawyer. When the guard came, he had already pulled off. He wasn't yelling when the deputy showed up. He had already pulled off. He had his phone to his head. And when the deputy told him to return to the courtroom, he did, and there were no further problems as far as we know. It's over. He expressed his anger. He did not express a threat. And therefore, this court should reverse these convictions. Thank you. Thank you. Counsel, may I be taken under advisement?